UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JEANETTE VERRETT                    CIVIL ACTION NO. 6:18-cv-01366

VERSUS                              JUDGE JUNEAU

ANDREW SAUL, COMMISSIONER           MAGISTRATE JUDGE HANNA
OF THE SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed and this matter

dismissed with prejudice.

## Administrative Proceedings

The claimant, Jeannette Verrett, fully exhausted her administrative remedies

before filing this action in federal court.   She filed applications for disability

insurance benefits ("DIB") and supplemental security income benefits ("SSI"),

alleging disability beginning on May 1, 2012.[1]  Her applications were denied.[2]  She

requested a hearing, which was held on March 21, 2017 before Administrative Law

---

[1]      Rec. Doc. 8-1 at 162, 168.

[2]      Rec. Doc. 8-1 at 102, 103.

Judge Thomas G. Henderson.[3]   The ALJ issued a decision on June 1, 2017, concluding that the claimant was not disabled within the meaning of the Social Security Act from June 27, 2013 (her modified alleged disability onset date) through the date of the decision.[4]   The claimant requested Appeals Council review of the ALJ's decision, but the Appeals Council found no basis for review.[5]   Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review.[6]   The claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

The claimant was born on February 25, 1962.[7]   At the time of the ALJ's decision, she was fifty-five years old.  She completed the twelfth grade[8] and has relevant work experience as a busser in a casino, a cook, and a security guard.[9]   She

---

[3]     A transcript of the hearing is found in the record at Rec. Doc. 8-1 at 46-69.

[4]     Rec. Doc. 8-1 at 23-32.

[5]     Rec. Doc. 8-1 at 4.

[6]     *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]     Rec. Doc. 8-1 at 162, 168.

[8]     Rec. Doc. 8-1 at 51, 195.

[9]     Rec. Doc. 8-1 at 52, 195.

alleged that she has been disabled since June 27, 2013 due to low back pain, arthritis in her knees, depression, anxiety, COPD, and breathing problems.[10]

On August 12, 2012, the claimant went to the emergency room at Iberia Medical Center in New Iberia, Louisiana, complaining of retrosternal chest pain.[11] She described the pain as sharp and stated that it lasted for half an hour to an hour and radiated into both of her arms.  She also complained of shortness of breath.  An EKG showed left ventricular hypertrophy with nonspecific abnormalities.  Her cardiac enzymes were normal but troponins were elevated.  She was taking twelve medications:  aspirin (treats pain and inflammation), nitroglycerin (treats chest pain), Protonix (treats acid reflux), Ativan (treats anxiety), Lisinopril (treats high blood pressure), Hydrochlorothiazide (treats high blood pressure), Lexapro (treats anxiety and depression), Apresoline (treats high blood pressure), Minoxidil (helps hair growth), Toprol (treats angina and high blood pressure), Tylenol (treats pain and fever), and Zofran (treats nausea and vomiting).  Dr. Robert Lewis's impressions were:  chest pain, angina, hypertension, left ventricular hypertrophy, elevated troponins, tobacco abuse, unknown lipid profile, and history of anxiety.  His plan was aggressive secondary prevention for atherosclerotic cardiovascular disease,

---

[10]    Rec. Doc. 8-1 at 194.

[11]    Rec. Doc. 8-1 at 251-253.

including a dobutamine stress echocardiogram and deep vein thrombosis prophylaxis.  He also advised the claimant to stop smoking.

Two weeks later, on August 24, 2012, the claimant returned to Iberia Medical Center for a cardiac catheterization procedure.[12]  Her preoperative and postoperative diagnoses were chest pain and positive dobutamine stress test.  Her blood pressure was 150/80.  Dr. Lewis's impressions were hypertension, elevated left ventricular end-diastolic pressure, coronary arteries with luminal irregularities, and a left ventricular ejection fraction of 55% or more[13] without segmental wall motion abnormalities.  His plan was to continue medical treatment.

On January 2, 2014, the claimant visited Family Nurse Practitioner Candice Miller at the Teche Action Clinic in Franklin, Louisiana.[14]  She complained of an aggravating dry cough for two months.  She gave a history of pneumonia in 2012, high blood pressure for two years, and arthritis for two years.  She reported a hospitalization in 2012 for shortness of breath and heart issues.[15]  The treatment note listed the following problems:  unspecified essential hypertension, tobacco use

---

[12]    Rec. Doc. 8-1 at 254-257.

[13]    A normal left ventricular ejection fraction ranges from 55% to 70%.  Cleveland Clinic, https://www.my.clevelandclinic.org/health/diseases/17069-heart-failure-understanding-heart-failure (last visited July 9, 2019).

[14]    Rec. Doc. 8-1 at 274-278.

[15]    The record contains no evidence of treatment for heart or pulmonary problems between 2012 and 2014.

disorder, obesity, microscopic hematuria, Vitamin D deficiency, lack of exercise, and chest pain.  She was already taking aspirin, garlic capsules, ibuprofen, Lexapro (treats anxiety and depression), Xanax (treats anxiety), Zyrtec (treats allergies), and Norvasc (treats high blood pressure).  The claimant reported no pain.  She stated that she smoked half a pack of cigarettes per day and had done so for thirty-five years.  She had followed up with regard to microscopic hematuria and was asymptomatic.  She had no joint pain, muscle pain, or muscle weakness.  Lisinopril was discontinued and Benicar was added (both treat high blood pressure).  She was to return in one month for a blood pressure check and in four months for follow up.  She was counseled to stop smoking.

On February 15, 2014, the claimant was examined by Dr. Mark M. Fujita for the purpose of assisting the state disability office in making a determination of disability.[16]  She told Dr. Fujita that she had fallen in 2009 and had multiple MRIs that showed bulging discs in her low back.  She complained of back pain with standing for long periods of time but denied numbness, tingling, or weakness in her legs.  She stated that she took Tylenol and an anti-inflammatory medication for her back pain.  She also related the fall in 2009 to knee pain.  She said that her knees had been x-rayed and that she had been diagnosed with osteoarthritis.  She stated

---

[16]    Rec. Doc. 8-1 at 259-262.

that she was not taking any medications for her knees and that they were painful only during weather changes.  The claimant also told Dr. Fujita that she became depressed after being hospitalized for a heart murmur and had to stop working.  She reported that she also suffered from anxiety.  She stated that she had panic attacks, which she controlled with breathing exercises and behavioral therapy.  The claimant explained that she was taking two medications for high blood pressure, after having been diagnosed with hypertension five years earlier.  She reported having throbbing headaches about twice per week for an hour.  She stated that her anxiety provoked the headaches, which were relieved with over-the-counter medications.   The claimant explained that she would be having further testing with a cardiologist related to her heart murmur.

Upon examination, the claimant ambulated without difficulty and was able to get on and off the exam table without difficulty.  She was able to dress and undress herself.  She was able to walk on her heels, walk on her toes, and walk heel-to-toe without difficulty.  Her gait was normal and she did not require an assistive device.  She had full lumbar spine flexion and hip flexion.  Straight leg raise tests were negative bilaterally in both the supine and sitting positions. X-rays showed a normal spine except for a narrow disc space at L5-S1.  She had a decreased range of motion in her knees but they were not swollen and she had normal leg strength.  She also stated that she was able to trust her knees and felt that they were strong.  The claimant

6

told Dr. Fujita that she had experienced depression since being unable to work.  She also stated that a recent cardiac work-up was stressful.  She denied suicidal or homicidal ideation and stated that she was taking Lexapro, Xanax, and Cetirizine (an antihistamine) to help with her mood.  Despite taking these medications, she stated that she continued to have panic attacks approximately every other day.  She denied being anxious.  Dr. Fujita noted that her speech and hygiene were good, she had a normal personal affect, and she had good interpersonal skills.  Furthermore, she "was able to perform all maneuvers without difficulty."

On April 9, 2014, psychologist Lynn L. Guidry, Ph.D. examined the claimant and then prepared a consultative examination report.[17]  Dr. Guidry observed that the claimant had a slightly unsteady gait and used a walking cane.  She was adequately oriented to the situation.  She stated that her back and leg were hurting and she was a little dizzy.  She cried a few times while discussing her social history.  She spoke logically and relevantly in a simplistic manner.  Dr. Guidry noted no evidence of current or past psychotic content or processes.  He found that she had adequate immediate recall, her short-term memory was intact, and her long-term memory was adequate for giving a social history.  He further found that her abstract thinking skills were somewhat deficient and her general verbal intelligence was in the low average

---

[17]      Rec. Doc. 8-1 at 265-269.

range.  He noted that she was able to describe her symptoms and repeat medical advice.  Her insight was functional and intact while her judgment was maladaptive at times in that she was not obtaining complete mental health treatment although her psychiatrist had recommended counseling in addition to medication.  However, in Dr. Guidry's opinion, her judgment was functional for daily living activities.  The claimant reported that she had back pain, knee pain, a heart murmur, and high blood pressure.  She stated that she had been on medication for anxiety and depression for about two years.  She denied ever being hospitalized for mental issues and denied having had mental health treatment prior to her current treatment.  She stated that the medication she was taking worked well but she still had a few panic attacks per week, each lasting about an hour.

Dr. Guidry diagnosed major depressive disorder – single episode – mild to moderate – with panic attacks.  He stated that he was not qualified to make judgments about the claimant's physical disability or limitations.  However, he observed that she walked slowly with a cane.  He noted that the onset of her depression and anxiety coincided with her physical limitations.  He also noted that she had always done simple repetitive jobs that did not require higher cognitive functioning.  He described her mental condition as characterized by panic attacks, agitation with others, and lapses of attention and concentration.  He speculated that her mental symptoms would be reduced if she was able to return to work.  While he

did not believe her mental difficulties would interfere with doing repetitive work, he opined that she would likely have erratic inconsistencies. He further opined that feedback from a supervisor would likely cause a significant agitation response. Dr. Guidry opined that behavior therapy might make her more functional in managing her agitation, which he thought was likely due to a combination of her pain level and frustration. Dr. Guidry recommended that the claimant should follow the medical advice from her treating physician, that she should seek counseling in addition to medication management for her mental issues, and that her daughter should manage her finances (as the claimant suggested to Dr. Guidry). Additionally, he noted that if her pain issues resolved, she would likely require the assistance of Louisiana Rehabilitation Services to obtain job training and employment. However, Dr. Guidry also opined that it was "highly unlikely that her current presentation of self (use of a cane, unsteady gait, crying during an interview) would likely not result in her making it through a job interview." Although Dr. Guidry stated that he reviewed treatment notes from Teche Action Clinic for the time period from May to August 2013, no such documents were included in the record.

A chest x-ray obtained at Franklin Foundation Hospital on April 12, 2014 due to the claimant's history of chest pain was normal.[18]

---

[18]    Rec. Doc. 8-1 at 285.

The claimant returned to the Teche Action Clinic on April 16, 2014.[19]  She reported having been to the emergency room twice over the prior weekend for chest pains,[20] and she reported that she was still experiencing chest pain and shortness of breath.  She reported having missed a cardiology appointment the previous month, which she was advised to reschedule.  She complained of epigastric burning, but she had not yet started taking previously prescribed proton-pump inhibitor medication.  She rated her pain at seven to eight on a ten-point scale.  The diagnoses were: unspecified essential hypertension, reflux esophagitis, anxiety state, nondependent tobacco use disorder, obesity, chest pain unspecified, exercise counseling, and dietary surveillance and counseling.

The claimant returned to the Teche Action Clinic for a routine visit on May 2, 2014.[21]  She reported no pain.  She was started on Drisdol for a Vitamin D deficiency and advised to keep her cardiology appointment.

An EKG obtained at University Hospital and Clinics ("UHC") in Lafayette, Louisiana, on May 5, 2014 was essentially normal, and chest x-rays obtained the same date showed no acute cardiopulmonary process.[22]

---

[19]    Rec. Doc. 8-1 at 286-288.

[20]    No records from these alleged hospitalizations were found in the record.

[21]    Rec. Doc. 8-1 at 294-296.

[22]    Rec. Doc. 8-1 at 300-302.

On May 13, 2014, the claimant returned to the Teche Action Clinic for a routine follow up visit.[23]  She denied being in pain, she denied having any gastrointestinal complaints, and she reported having a cardiology appointment scheduled for June.  She was advised to follow a low salt diet.  She was taking the following medications:  All Day Allergy (cetirizine, an antihistamine used to relieve allergy symptoms), aspirin, Benicar (treats hypertension), Dicyclomine (treats irritable bowel syndrome), Drisdol (treats Vitamin D deficiency), Escitalopram (treats depression and anxiety), garlic capsules (treats high blood pressure), ibuprofen (treats pain and inflammation), Lexapro (treats depression and anxiety), Mirtazapine (treats depression), Omeprazole (treats acid reflux), Remeron (treats depression), Xanax (treats anxiety), Zyrtec (treats allergies), and Norvasc (treats high blood pressure).  It was noted that the claimant's mental health was managed by Dr. Bergeron.[24]

The claimant returned to the Teche Action Clinic on September 16, 2014 still complaining of shortness of breath; she also complained of other symptoms unrelated to her disability claim.[25]  It was noted that she had shortness of breath on

---

[23]    Rec. Doc. 8-1 at 303-305.

[24]    The record contains no treatment notes from Dr. Bergeron.

[25]    Rec. Doc. 8-1 at 306-311.

exertion, had been seen in the cardiology department at UHC,[26] and used Proventil (an albuterol inhaler). She denied being in pain.

The claimant followed up at the Teche clinic on November 5, 2014,[27] reporting shortness of breath with activity on a daily basis that resolved with rest. She denied any pain. It was noted that she had undergone a sleep study that showed obstructive sleep apnea, but the claimant reported that she could not afford a CPAP machine. The diagnoses assigned were: unspecified essential hypertension, reflux esophagitis, anxiety state, obesity, exercise counseling, dietary surveillance and counseling, and obstructive sleep apnea. Her Xanax prescription was discontinued.

On January 20, 2015, the claimant was seen in the emergency department at UHC.[28] She complained of having had intermittent left-sided chest pains for two months that was worse that day with shortness of breath. She rated the pain at six on a ten-point scale and reported that it worsened with activity and improved with rest. She also reported that her chest pain usually resolved in about thirty minutes, but the day before, the pain had lasted several hours. She reported having stopped smoking nine months earlier. She also reported being noncompliant with her CPAP

---

[26]     No records from UHC predating this visit were found in the record except for the diagnostic test results referenced above.

[27]     Rec. Doc. 8-1 at 312-316.

[28]     Rec. Doc. 8-1 at 339-464.

machine because it made her claustrophobic.  An echocardiogram on that same day showed a hyperdynamic left ventricle.  On January 21, 2015, a coronary angiogram and left heart catheterization procedure was performed for the purpose of ruling out acute coronary syndrome.  The angiogram showed normal coronary arteries.  Chest x-rays showed no acute cardiopulmonary process.  It was recommended that the claimant control her blood pressure and that she be evaluated for non-coronary artery chest pain.  During that night, the claimant had an episode of burning substernal/epigastric pain after a heavy meal, which was immediately relieved with a GI cocktail.  On further questioning, the claimant reported acid reflux symptoms consistent with gastroesophageal reflux disease ("GERD") despite taking Prilosec (treats stomach and esophagus problems such as acid reflux) daily.  On January 22, 2015, the claimant was diagnosed with chronic obstructive pulmonary disease ("COPD") following a pulmonary function test.  She was discharged from the hospital with a Prilosec prescription, a prescription for Metoprolol (treats chest pain and high blood pressure), and instructions to schedule an esophagogastroduodenoscopy ("EGD") procedure.  The discharge diagnoses were COPD, GERD, obstructive sleep apnea, and hypertension.

At a follow-up visit in the UHC Internal Medicine Clinic on February 18, 2015,[29] the claimant reported mild shortness of breath, occasional cough, and improved heartburn. She had been scheduled to get pulmonary function tests done after her discharge from the hospital but had not done so. She admitted that she was not compliant with diet recommendations and was not using her CPAP regularly.

She followed up at UHC again on April 9, 2015.[30] She was assessed with COPD with chronic bronchitis (for which she was prescribed Advair and albuterol inhalers), hypertension, morbid obesity, GERD, and obstructive apnea. She was to continue her current hypertension and GERD medications, she was counseled on exercise and weight loss, and she was advised to adhere to CPAP usage instructions.

The claimant began mental health treatment at the St. Mary Mental Health Clinic in Morgan City, Louisiana in January 2015.[31] In a counseling session on March 2, 2015,[32] she stated that she was feeling depressed and eating too much. She also reported chest pain and trouble breathing. She explained that her depression had worsened when she left work, and she stated that she left her job because it was too stressful.

---

[29]    Rec. Doc. 8-1 at 428-440.

[30]    Rec. Doc. 8-1 at 442-443.

[31]    Rec. Doc. 8-1 at 324, 325.

[32]    Rec. Doc. 8-1 at 328.

On March 5, 2015, the claimant saw psychiatrist Dr. Eben L. McClenahan at the St. Mary Mental Health Clinic.[33]  He noted that her eye contact was good, her affect was appropriate, her mood was euthymic, her speech was within normal limits, her attitude was cooperative, she had no thoughts of harming herself or others, her thought process was logical and unremarkable, her thought content was nonpsychotic, her perception was unremarkable, she was appropriately oriented, her concentration was fair, her memory was intact, and her intellect, insight and judgment were fair.  Dr. McClenahan described the severity of her symptoms as mild and much improved.  His diagnosis was major depressive disorder, recurrent, severe with psychotic features.

On March 9, 2015, the claimant followed up at the Teche Action Clinic for routine health maintenance.[34]  She denied having chest pain or shortness of breath at that time and reported on her recent hospitalization, including the COPD diagnosis. She stated that she was now using her CPAP and taking Proair (an inhaler that treats asthma and shortness of breath) twice daily.  She was advised to avoid carbonated drinks, exercise four to six times per week, avoid excessive salt intake, and adhere to a program of heart healthy nutrition.

---

[33]     Rec. Doc. 8-1 at 330-331.

[34]     Rec. Doc. 8-1 at 317-322.

On April 6, 2015, the claimant had a psychotherapy session at the St. Mary Mental Health Clinic.[35]   She reported that she had not wanted to attend the appointment but her daughter encouraged her to do so.  It was noted that she was quiet but friendly and had to be prompted to participate.  She indicated that she wanted to work on managing her anxiety, improving her mood, and learning how to express her anger.  She stated that she was compliant with her medication.

The claimant returned to the Teche Action Clinic on July 2, 2015, complaining of right knee pain.[36]   She reported having had similar pain for several years and having been told it was arthritis, but the pain had worsened over the previous four days.  She had taken Tylenol without relief.  Her gait was normal.  Examination of the right knee showed edema, a full range of motion, crepitus, and pain with palpation.  She was instructed to apply ice packs four times per day for ten minutes at a time and was given a trial of Difclofenac (treats the pain, swelling, and joint stiffness caused by arthritis).

The claimant returned to the Teche Action Clinic on September 18, 2015.[37] She complained of shortness of breath and stated that she used Advair "every now and then."  She also complained of right knee pain, ongoing for several years, and

---

[35]     Rec. Doc. 8-1 at 326.

[36]     Rec. Doc. 8-1 at 526-529.

[37]     Rec. Doc. 8-1 at 519-525.

stated that over-the-counter medications were not helping.  Her gait was normal, as was her left leg.  No redness was noted on her right knee, but there was swelling to the suprapatellar area as well as crepitus.  She was prescribed Advair and ProAir for her COPD, lab work and an x-ray of her right knee were scheduled, and she was evaluated for depression.

The claimant was again seen at the Teche Action Clinic on December 3, 2015.[38]  She reported coughing for three days and a runny nose.  She complained of chest pain due to coughing, body aches, and shortness of breath.  She also reported limited use of Advair and ProAir.  Examination showed some wheezing.  She rated her chest pain at seven to eight on a ten-point scale.  The claimant had not obtained an x-ray of her right knee.  Several of her medications were discontinued, leaving the following list of medications:  Advair, All Day Allergy, Alprazolam, Aspirin, Benicar, Ibuprofen, Lexapro, Norvasc, and ProAir.

The claimant was seen again at the Teche Action Clinic on April 7, 2016 for chronic disease management and medication refills.[39]  She was not in pain.  She was encouraged to eat heart healthy meals and to exercise.  She admitted eating foods not in compliance with nutritional advice.  She was advised to use her CPAP machine as directed.  Because she admitted not using ProAir and Advair as directed,

---

[38]    Rec. Doc. 8-1 at 514-518.

[39]    Rec. Doc. 8-1 at 507-513.

instructions for proper usage were again provided.  Ibuprofen was discontinued, and the dosage of Norvasc was adjusted.

The claimant was seen by cardiologist Dr. Brent Rochon on August 4, 2016 for complaints of hypertension and occasional chest pain.[40]  His diagnoses were angina pectoris, unspecified; essential (primary) hypertension; obesity, unspecified; and nonrheumatic aortic valve disorder, unspecified.  He ordered a PET scan of her heart and an echocardiogram.  She was to increase her dosage of Amiodipine (treats high blood pressure) and to monitor her blood pressure.

The claimant followed up at the Teche Action Clinic on August 5, 2016 for a review of lab results.[41]  She complained of back pain that she rated at seven to eight on a ten-point scale.  She was to continue taking her hypertension medications and keep her cardiology appointments.  She reported that she did not have a CPAP machine and requested one.  Her glucose levels were abnormal, and she was counseled on weight loss, exercise, and healthy nutrition.  She was advised to stop using Tylenol daily.

---

[40]    Rec. Doc. 8-1 at 477-479.

[41]    Rec. Doc. 8-1 at 497-506.

The claimant returned to the Teche Action Clinic on August 18, 2016.[42]  She again complained of back pain that she rated at seven to eight, and she indicated that her depression symptoms were unchanged.

On January 2, 2017, the claimant was again seen at the Teche Action Clinic.[43] She reported having had chronic low back pain since 2008, having seen a pain management physician, and having had an MRI of the low back that showed "bad discs."[44]  She reported that she was taking Ibuprofen without relief.  She was counseled to use caution with Ibuprofen and to take it with food due to her GERD. She requested a referral for an MRI.  It was noted that she was able to get on and off the exam table without difficulty, no atrophy was noted, and her strength was equal in her legs.  She reported having seen Dr. Rochon, her cardiologist, the day before. She was given a prescription for Ibuprofen 600 mg. and advised to keep her routine appointments.

On January 12, 2017, the claimant returned to the Teche clinic requesting a refill of medications.  The assessments were heartburn and hypertension.  She was prescribed Pantoprazole (treats stomach and esophagus problems).

---

[42]    Rec. Doc. 8-1 at 491-496.

[43]    Rec. Doc. 8-1 at 536.

[44]    The record contains no documentary evidence of MRI testing and no documentary evidence of the claimant having seen a pain management specialist.

The claimant saw Dr. Rochon, the cardiologist, on January 24, 2017 for a six-month follow-up visit.[45]  It was noted that her blood pressure was well controlled but she was still having chest pain with exertion, which was relieved with rest.  Due to a change in her insurance, she had not had recommended testing done.  Dr. Rochon ordered an echocardiogram, imaging, and a treadmill nuclear stress test.  His diagnoses were cardiac murmur, unspecified; angina pectoris, unspecified; nonrheumatic aortic valve disorder, unspecified; essential (primary) hypertension; and obesity, unspecified.

The claimant was again seen at Teche Action Clinic on January 25, 2017.[46] She complained of low back pain and was counselled with regard to diet, exercise, and other issues.

On January 31, 2017, the claimant had a nuclear stress test at Franklin Foundation Hospital.[47]  She saw Dr. Rochon on February 14, 2017 for test results.[48] Dr. Rochon noted that her blood pressure was elevated (183/92), her heart rate was 82 beats per minute, and she was still reporting chest pain with exertion and relief with rest.  He also noted that the nuclear stress test did not exclude mild anterior

---

[45]     Rec. Doc. 8-1 at 473-475.

[46]     Rec. Doc. 8-1 at 486-490.

[47]     Rec. Doc. 8-1 at 481-482.

[48]     Rec. Doc. 8-1 at 469-471.

ischemia.[49]  On February 28, 2017, the claimant had an echocardiogram,[50] which showed a left ventricular ejection fraction estimated at 81.47%,[51] severe concentric left ventricular hypertrophy,[52] and mild tricuspid valve regurgitation.[53]

On March 21, 2017, the claimant testified at a hearing regarding her symptoms and her medical treatment.  She stated that she had arthritis in her right knee and used a cane because her legs sometimes gave out.  However, she admitted that the cane was not prescribed by a doctor.  She stated that the pain in her knee prevents her from doing things.  She explained that she had been treated for depression but had not recently been going to the St. Mary Mental Health Clinic on a regular basis.

---

[49]    "Myocardial ischemia, also called cardiac ischemia, reduces the heart muscle's ability to pump blood."  Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/symptoms-causes/syc-20375417 (last visited July 10, 2019).

[50]    Rec. Doc. 8-1 at 483-484.

[51]    A normal left ventricular ejection fraction ranges from 55% to 70%.  Cleveland Clinic, https://www.my.clevelandclinic.org/health/diseases/17069-heart-failure-understanding-heart-failure (last visited July 9, 2019).

[52]    "Left ventricular hypertrophy is enlargement and thickening (hypertrophy) of the walls of your heart's main pumping chamber (left ventricle).  Left ventricular hypertrophy can develop in response to some factor – such as high blood pressure or a heart condition – that causes the left ventricle to work harder. . .  The enlarged heart muscle loses elasticity and eventually may fail to pump with as much force as needed. . . put[ting] you at higher risk of a heart attack and stroke."  Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/symptoms-causes/syc-20374314 (last visited July 10, 2019).

[53]    "Tricuspid valve regurgitation is a condition in which the valve between the two right heart chambers (right ventricle and right atrium) doesn't close properly.  The malfunctioning valve allows blood to flow back into your heart's upper right chamber (right atrium)."  Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/tricuspid-valve-regurgitation/symptoms-causes/syc-20350168 (last visited July 10, 2019).

She stated that she was taking prescriptions for anxiety and depression.  She further explained that she was under the care of Dr. Rochon, a cardiologist, for chest pain and heart problems.  She explained that either every day or every other day, for approximately thirty minutes to an hour, her chest was so tight that she was out of breath and it felt as though she was going to have a heart attack.  The claimant explained that she stopped working in 2012 after she was rushed to the hospital from work because they thought she was going to have a stroke.  She did not attempt to return to work thereafter.  She stated that, in a typical day, she can spend about an hour and a half to two hours on her feet, can walk only the distance from one room to another in her house, and does not do any exercise walking.  She stated that she was approximately 5'5" and 250 pounds.  She stated that she was tested for sleep apnea and used a CPAP machine.  She said she passed her time by reading, doing a little cooking for she and her mother (who lives with her), and watching a lot of TV.  She stated that she dozed off during the day but had trouble sleeping at night.  She did not know if this was caused by her medication.  She stated that she was unable to sweep or engage in many activities because she became short of breath.

The claimant seeks to have the Commissioner's adverse decision reversed.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[54] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[55] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[56]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[57] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[58] Conflicts in

---

[54]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[55]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[56]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[57]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[58]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[59] and credibility assessments[60] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[61]

## B.    <u>Entitlement to Benefits</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[62]  The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[63]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

---

[59]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[60]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[61]    *Wren v. Sullivan*, 925 F.2d at 126.

[62]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1765, 1772 (2019).

[63]    42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

24

last for a continuous period of not less than twelve months."[64]  A claimant is disabled

only if his physical or mental impairment or impairments are so severe that he is

unable to not only do his previous work, but cannot, considering his age, education,

and work experience, participate in any other kind of substantial gainful work which

exists in significant numbers in the national economy, regardless of whether such

work exists in the area in which the claimant lives, whether a specific job vacancy

exists, or whether the claimant would be hired if he applied for work.[65]

In this case, the ALJ found that the claimant meets the insured status

requirements of the Social Security Act through December 31, 2028.[66]  In her

briefing, however, the claimant stated that her insured status for Title II benefits

expired in September 2011, prior to the alleged disability onset date, making this a

claim for SSI benefits only.[67]  According to the evidence in the record, the claimant

was a Medicare-qualified government employee, employed by the St. Mary Parish

Sheriff's Office from 2006 through 2012 and did not earn any qualifying quarters

during those years.[68]  However, the disability examiners found that her date last

---

[64]     42 U.S.C. § 1382c(a)(3)(A).

[65]     42 U.S.C. § 1382c(a)(3)(B).

[66]     Rec. Doc. 8-1 at 25.

[67]     Rec. Doc. 9 at 2.

[68]     Rec. Doc. 8-1 at 179-181.

insured was December 31, 2028.[69]  Because this Court is recommending that the Commissioner's decision be affirmed and this matter dismissed with prejudice, resolution of this discrepancy is not necessary.

## C.   Evaluation Process and Burden of Proof

A sequential five-step inquiry is used to determine whether a claimant is disabled.  This process requires the Commissioner to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform other work.[70]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[71] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[72]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[73]

---

[69]   Rec. Doc. 8-1 at 73, 78, 83,

[70]   20 C.F.R. § 404.1520.

[71]   20 C.F.R. § 404.1520(a)(4).

[72]   20 C.F.R. § 404.1545(a)(1).

[73]   20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[74]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[75]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[76]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[77]

## D.    The ALJ's Findings and Conclusions

The ALJ determined, at step one of the sequential analysis, that the claimant has not engaged in substantial gainful activity since June 27, 2013 (the amended alleged disability onset date).[78]  This finding is supported by substantial evidence in the record.

---

[74]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[75]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[76]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[77]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[78]    Rec. Doc. 8-1 at 25.

At step two, the ALJ found that the claimant has the following severe impairment:  major depressive disorder.[79]  This finding is supported by substantial evidence in the record.  The claimant argued that the ALJ erred in failing to find that her cardiovascular condition and knee condition were also severe impairments.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[80]  The claimant did not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform the full range of work at all exertional levels but also found that the claimant should be limited to performing simple, routine, and repetitive tasks with no fast-paced production requirements or rigid quotas.[81]  The claimant challenged this finding, arguing that she is capable of performing only sedentary work, which at her age, mandates a finding that she is disabled.

At step four, the ALJ found that the claimant is not capable of performing her past relevant work.[82]  The claimant did not challenge this finding.

---

[79]    Rec. Doc. 8-1 at 25.

[80]    Rec. Doc. 8-1 at 27.

[81]    Rec. Doc. 8-1 at 29.

[82]    Rec. Doc. 8-1 at 30-31.

At step five, the ALJ found that the claimant was not disabled from June 27, 2013 through June 1, 2017 because there are jobs in the national economy that she can perform.[83]  The claimant challenged this finding, arguing that the ALJ relied on testimony from a vocational expert that was flawed because it was based on a hypothetical question that did not encompass all of the claimant's impairments.

## E.    The Allegations of Error

The claimant contends that the ALJ erred (1) by failing to consider and evaluate all of the evidence; (2) by failing to find that the claimant has severe exertional impairments; and (3) by relying on vocational expert testimony that failed to consider all of the claimant's impairments.  The claimant also contends that the Appeals Council erred in failing to review the ALJ's decision.

## F.    Did the ALJ Consider All of the Evidence?

The claimant submitted additional evidence into the record after the hearing.  The additional evidence was designated as Exhibits 8F and 9F.  This evidence consisted of three treatment notes from the claimant's cardiologist, Dr. Rochon, from August 2016, January 2017, and February 2017, together with reports on a nuclear stress test and an echocardiogram ordered by Dr. Rochon, as well as ten treatment notes from the Teche Action Clinic, the claimant's primary care provider, dated

---

[83]    Rec. Doc. 8-1 at 32.

between March 2015 and January 2017.  The claimant contends that the ALJ erred because he disregarded this evidence.

While the ALJ did not provide a detailed summary of the evidence submitted after the hearing, the ALJ's ruling does include a specific reference to Exhibits 8F and 9F.[84]  The ALJ also stated expressly that he considered the entire record in making his findings.[85]  "[T]here is no statutorily or judicially imposed obligation for the ALJ to list explicitly all the evidence he takes into account in making his findings"[86] and an "ALJ's failure to mention a particular piece of evidence does not necessarily mean that he failed to consider it."[87]

The claimant argued that "boilerplate language about carefully considering the entire record does not constitute an explanation for rejecting a medical opinion."[88]  But the ALJ did not rely upon boilerplate language to reject a medical opinion.  There are no medical opinions in the record addressing the functional

---

[84]     Rec. Doc. 8-1 at 25.

[85]     Rec. Doc. 8-1 at 25.

[86]     *Hammond v. Barnhart*, 124 Fed. App'x 847, 851 (5th Cir. 2005).

[87]     *Hammond v. Barnhart*, 124 Fed. App'x at 851.  See, also, *Brunson v. Astrue*, 387 Fed. App'x 459, 461 (5th Cir. 2010) ("The fact that the ALJ cited certain evidence that he felt supported his decision does not mean that he failed to consider all of the other evidence in the record.")

[88]     *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017).

limitations resulting from the claimant's cardiovascular condition or her knee condition. Accordingly, this assignment of error lacks merit.

## G.    Did the ALJ Properly Evaluate the Severity of the Claimant's Impairments?

The ALJ found that the claimant's depression is severe. The claimant argued that the ALJ should also have found that her cardiovascular problems and her knee problem are also severe. An impairment is not severe only when it is a "slight abnormality" having "such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience."[89]

The claimant reported to consultative examiner Dr. Fujita that she fell in 2009, injuring both her low back and her right knee. The record contains no treatment notes or diagnostic test results related to the incident in which she was allegedly injured and no treatment by an orthopedist, neurologist, or other specialist for either her back or her knee. The ALJ was incorrect when he stated in his ruling that the claimant received no treatment for her knee after 2009;[90] however, the claimant

---

[89]    *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

[90]    Rec. Doc. 8-1 at 27.

testified at the hearing that she had received no treatment for her knee after 2009.[91] Thus, the claimant herself is the likely source of the ALJ's confusion on this point.

When the claimant applied for Social Security benefits, she cited arthritis in her knees as a basis for her alleged disability.  The claimant reported to Dr. Fujita in February 2014 that x-rays had shown that she had arthritis in both knees, but she also told him that she was taking no medication for this condition and that her knees were painful only when the weather changed.  Dr. Fujita examined her knees and found that she had a decreased range of motion in her knees, but they were not swollen and her leg strength was normal.  Dr. Fujita noted that her gait was normal, she did not use a cane or other assistive device, she had no difficulty getting on and off the examination table, and the claimant reported to him that she felt her knees were strong and that she trusted them.  When the claimant saw Dr. Guidry in April of 2014, she listed knee pain among her symptoms but Dr. Guidry did not evaluate her physical complaints.

In July 2015, the claimant complained of right knee pain at an appointment at the Teche clinic.  This is the earliest treatment note in the record documenting that the claimant sought treatment for her allegedly arthritic knees.  The examiner found that she had a normal gait and that her left leg was normal.  In her right knee,

---

[91]    Rec. Doc. 8-1 at 54.

however, she had edema, crepitus, and pain with palpation despite having a full range of motion.  Medication was prescribed to treat the pain and inflammation, she was told to apply ice packs to her knee, and she was told to avoid over-the-counter nonsteroidal anti-inflammatory drugs.

When the claimant returned to the Teche clinic in September 2015, she again complained of right knee pain.  She reported taking over-the-counter medications for the pain and using cool compresses.  Her gait was normal as were the tone, bulk, and strength of her right leg.  Swelling and crepitus in the right knee were present, and an x-ray of the knee was ordered.  But when the claimant returned to the Teche clinic in December 2015, she had not obtained the x-ray.  There is no evidence that the claimant ever had her right knee x-rayed, and there is no evidence of any other diagnostic testing of the knee or any further treatment for the knee.  At the hearing in March 2017, she claimed that her knee kept her from doing things, and she stated that she used a cane because of her knee.  But she also stated that no doctor had prescribed the cane.

In February 2014, the claimant told Dr. Fujita that, after the fall in 2009, she had several MRIs that diagnosed bulging discs in her low back, and she reported back pain with standing for long periods of time but denied numbness, tingling, or weakness in her legs.  But no MRI reports or other diagnostic studies of the claimant's back are in the record.  The claimant reported to Dr. Fujita that she took

33

Tylenol and an anti-inflammatory medication for her back pain.  Straight leg raise tests were negative, and Dr. Fujita noted that her lumbar spine was within normal limits except for a narrow disc space at L5-S1.  Her gait was normal, and she had no difficulty performing requested maneuvers.  When the claimant saw Dr. Guidry a few months later, she reported back and leg pain, but Dr. Guidry did not evaluate her physical complaints.

The record contains no evidence that the claimant sought treatment for her back pain between 2009 and 2016.  A failure to seek treatment may be an indication of nondisability.[92]  In August 2016, the claimant complained of severe back pain at two appointments at the Teche clinic, but no clinical examinations or observations corroborated her pain complaints.  In January 2017, she again complained of back pain at an appointment at the Teche clinic, but it was noted that she was able to get on and off the exam table without difficulty, no atrophy was noted, and her legs were equal in strength.  She was not referred by her primary care provider to an orthopedist or neurologist nor was any diagnostic testing performed even though she requested an MRI.  No strong pain medication or physical therapy was prescribed.

---

[92]    *Doss v. Barnhart*, 137 Fed. App'x 689, 690 (5th Cir. 2005).  See, also, *Villa v. Sullivan*, 895 F.2d at 1024.

Pain can constitute a disabling impairment,[93] but pain is disabling only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment.[94] Mild or moderate pain is not disabling. Furthermore, subjective complaints, such as complaints of pain, must be corroborated by objective medical evidence.[95] While an ALJ must take into account a claimant's subjective allegations of pain in determining residual functional capacity, the claimant must produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged.[96] The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence.[97] The absence of objective factors can justify the conclusion that a witness lacks credibility.[98] In this case, the lack of objective medical evidence corroborating the claimant's pain complaints justified the ALJ's conclusion that the claimant's alleged back and knee pain were not severe.

---

[93]    *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).

[94]    *Falco v. Shalala,* 27 F.3d at 163; *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990).

[95]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

[96]    *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).

[97]    *Harper v. Sullivan*, 887 F.2d at 96.

[98]    *Dominguez v. Astrue*, 286 Fed. App'x 182, 187 (5th Cir. 2008) (citing *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988) (*per curiam*)).

The claimant also argued that her cardiovascular problems are severe. Although she was diagnosed with a heart problem, there is no clinical corroboration for the limitations allegedly resulting from this problem.   The claimant's cardiologist, Dr. Rochon, did not opine with regard to the claimant's functionality. The claimant complained of chest pain and shortness of breath.  The claimant did not establish that her chest pain was constant, unremitting, or unresponsive to treatment.  Her shortness of breath was at least partially substantiated by her COPD diagnosis.  But she failed to comply with the medication protocol prescribed by her health care providers for that condition, postponing diagnostic testing and failing to take medication as prescribed.  This may indicate nondisability.[99]

Following a careful reading of the ALJ's decision, this Court finds that the ALJ applied the proper severity standard in reaching his conclusion regarding the severity of the claimant's medical conditions.   This Court further finds that substantial evidence supports the ALJ's severity finding.  The claimant failed to prove that her cardiovascular, back, and knee impairments are severe.

## H.    Did the ALJ Ask a Defective Hypothetical Question?

The claimant contends that the vocational expert's testimony at the hearing was not reliable because it was based on a defective hypothetical question that did

---

[99]        See *Johnson v. Sullivan*, 894 F.2d 683, 685 n. 4 (5th Cir. 1990).

not encompass all of the claimant's impairments.  More particularly, the claimant objected to the fact that the hypothetical question posed by the ALJ at the hearing did not include any physical limitations.  The claimant argued that a proper hypothetical question would have acknowledged the claimant's knee pain due to arthritis in her right knee and shortness of breath and chest pain due to a cardiovascular condition.

A hypothetical question posed to a vocational expert is not defective if it reasonably incorporates all disabilities of the claimant recognized by the ALJ and if the claimant or his representative is given an opportunity to correct deficiencies in the ALJ's question by suggesting to the vocational expert any purported defects in the ALJ's hypothetical question.[100]  In this case, both criteria were satisfied.

First, the ALJ asked a question that incorporated only nonexertional impairments because that is all that the ALJ recognized.  At the time of the hearing, the record did not contain any treatment notes from the claimant's cardiologist, Dr. Rochon, and it did not contain documentation of any visits with health care providers in which the claimant sought treatment for her arthritic knee.  All evidence in that regard was submitted by the claimant after the hearing.  Accordingly, the ALJ did not err in failing to incorporate into his hypothetical question impairments that had

---

[100]     *Bowling v. Shalala*, 36 F.3d at 436.

not yet been substantiated with evidence in the record.  Second, the claimant's attorney was permitted to pose a question to the vocational expert that included additional impairments not recognized by the ALJ.

Therefore, this Court concludes that the hypothetical question directed by the ALJ to the vocational expert at the hearing was not so defective as to require remand of this matter.

## I.    Did the Appeals Council Err in Failing to review the ALJ's Decision?

The claimant alleged that the Appeals Council erred when it failed to review the ALJ's decision.  This argument lacks merit.  Under 42 U.S.C. § 422.210(a), "[a] claimant may obtain judicial review of a decision by an administrative law judge if the Appeals Council has denied the claimant's request for review, or of a decision by the Appeals Council when that is the final decision of the Commissioner."  In this case, the Appeals Council denied the claimant's request for review,[101] and the ALJ's decision became the final decision of the Commissioner.[102]  Therefore, the claimant is entitled to judicial review of the ALJ's decision, but is not entitled to separate review of the Appeals Council's decision.

## Conclusion and Recommendation

For the foregoing reasons,

---

[101]    Rec. Doc. 8-1 at 4.

[102]    *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

38

IT IS THE RECOMMENDATION of this Court that the decision of the Commissioner be AFFIRMED and this matter be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[103]

Signed at Lafayette, Louisiana, this 18th day of July 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[103]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).